UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| UNITED STATES SUGAR CORPORATION, *Plaintiff*, v. COMMERCE AND INDUSTRY INSURANCE COMPANY, *Defendant*. | CASE NO.: |

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, United States Sugar Corporation ("U.S. Sugar"), by and through its undersigned counsel, hereby files this Complaint for Breach of Contract against Defendant, Commerce and Industry Insurance Company ("AIG"), and alleges as follows:

### NATURE OF THE ACTION

1. This is a diversity action for Breach of Contract arising out of AIG's failure and refusal to cover any of U.S. Sugar's substantial defense expenses incurred while defending against a putative class action lawsuit over the course of nearly three years.

2. U.S. Sugar was sued in the District Court for the Southern District of Florida on June 4, 2019, by putative class plaintiffs in connection with U.S. Sugar's practice of pre-harvest sugarcane burning – a safe, acceptable, decades-old method of harvesting that is strictly regulated and performed pursuant to permits issued by the Florida Forest Service. The underlying liability lawsuit – which was ultimately abandoned by the putative class plaintiffs and their counsel –

1

generally alleged that nearby citizens and property were harmed by U.S. Sugar's closely-controlled practice.

3. At the inception of the underlying lawsuit, U.S. Sugar dutifully provided notice to AIG, its general liability insurer who collected a significant premium and issued an insurance policy intended to cover allegations of bodily injury and property damage precisely like those contained in the putative class action.

4. U.S. Sugar's insurance policy, like virtually all general liability policies in the marketplace, required the insurer to pay the defense expenses associated with the lawsuit after U.S. Sugar paid the first $1 million out of pocket (a self-insured retention). Once defense expenses exceed the $1 million threshold, the payment obligation for those amounts shifts to the insurer.

5. After receiving notice of the underlying lawsuit, AIG did not dispute that the allegations gave rise to potential liability for the very types of bodily injury and property damage covered by the policy. Instead, despite issuing a typical duty to defend policy, AIG inexplicably took the position that U.S. Sugar's defense expenses did not count at all toward the $1 million self-insured retention. Rather, it maintained that only actual indemnity payments by U.S. Sugar – such as a settlement or judgment – could reduce the retention. If U.S. Sugar did not pay at least $1 million in the form of indemnity, AIG asserted that it owed nothing despite clear policy language to the contrary.

6. U.S. Sugar subsequently exchanged numerous correspondence with AIG to demonstrate that the insurer's coverage position was contrary to the policy's plain language. AIG refused to amend its position despite its own policy provisions, U.S. Sugar's explanations, or the Civil Remedy Notice filed by U.S. Sugar to perfect its right to bring a future statutory bad faith claim pursuant to Fla. Stat. § 624.155.

7. Based on its coverage position, AIG abandoned U.S. Sugar, took no part in the underlying lawsuit, and left U.S. Sugar to defend its interests as it deemed appropriate. While U.S. Sugar has now successfully defeated the underlying lawsuit nearly three years later, it did so by shouldering the burden of seven-figure attorneys' fees and costs that should have been covered by AIG.

8. AIG's failure to pay a single dollar under the policy despite U.S. Sugar's exhaustion of the $1 million self-insured retention constitutes a breach of the insurance contract.

9. AIG's conduct also reflects the type of bad faith for which the Florida legislature has created a statutory remedy.

10. This action seeks to recover the amounts due to U.S. Sugar under its insurance contract with AIG.

11. This complaint will also be subject to amendment after a coverage determination is made so U.S. Sugar can seek the statutory bad faith remedies provided under Florida law, including treble damages.

**PARTIES**

12. Plaintiff, United States Sugar Corporation, is a Delaware corporation with its principal place of business in Clewiston, Florida. United States Sugar Corporation is the named insured under the subject insurance policy issued by the Defendant.

13. Defendant, Commerce and Industry Insurance Company, is an affiliate of AIG and a New York corporation with its principal place of business in New York, New York. Commerce and Industry Insurance Company is an insurer authorized sell insurance in the state of Florida and, on information and belief, is actively engaged in the business of selling insurance in Hendry County and throughout the state of Florida. Commerce and Industry Insurance Company issued

an insurance policy to United States Sugar Corporation at United States Sugar Corporation's principal address in Clewiston, Florida.

14. There is complete diversity of citizenship between United States Sugar Corporation and Commerce and Industry Insurance Company.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

16. This Court has personal jurisdiction over Commerce and Industry Insurance Company because it: (1) is authorized to sell insurance in the state of Florida, (2) generally transacts business throughout the state of Florida, and (3) contracted to insure a Florida corporation with business operations in this judicial district.

17. Venue is proper in this Court pursuant to 28 U.S.C. §1391, as this is a diversity action in which a substantial part of the events or omissions giving rise to the claims and losses occurred in this judicial district.

## FACTUAL BACKGROUND

### U.S. Sugar and the Putative Class Action Lawsuit

18. U.S. Sugar is a farming company founded in 1931 that grows sugarcane, citrus, and fresh vegetables.

19. The company's local farmers in the state of Florida provide nearly 10 percent of all sugar produced in the United States and half of Florida's sweet corn crop.

20. In total, the company farms 245,000 acres in Palm Beach, Glades, Hendry, and Martin counties and provides approximately 1,750 jobs throughout the state of Florida.

21. Sugarcane is U.S. Sugar's main business. Each year the company plants, harvests, and processes sugarcane into about 850,000 tons of refined sugar that is used across the spectrum from food manufacturers to individual customers at grocery stores.

22. Because the safety of the community and its employees is a primary concern for U.S. Sugar, the company uses controlled, pre-harvest burns to reduce wildfires and create a more effective harvesting process.

23. This process is strictly regulated and well-controlled through the Florida Forest Service. The Florida Forest Service has pioneered conservation through controlled, prescribed fires, explaining that "prescribed burns are an effective tool to reduce fuel buildups, which can cause dangerous wildfire conditions." These prescribed fires reduce dry brush and help preserve Florida's valuable ecosystems.

24. The Florida Forest Service issues permits for many different kinds of prescribed burns, not just burns related to the pre-harvest of sugarcane.

25. During harvest season, sugarcane fields are burned in contained, individual fields – 40 or 80 acres at a time – with fires lasting 15 to 20 minutes on average.

26. U.S. Sugar receives permits on a daily basis to ensure that a comprehensive review of weather conditions and the surrounding area (or proximity to sensitive areas) has taken place.

27. Notwithstanding the closely-regulated and state-approved nature of pre-harvest sugarcane burning, two plaintiffs commenced a putative class action lawsuit on June 4, 2019 against U.S. Sugar and numerous other companies engaged in this practice. That action was filed in the United States District Court for the Southern District of Florida, styled *Clover Coffie, et al. v. Florida Crystals Corp., et al.*, Case No. 9:19-cv-80730-DMM (the "Underlying Lawsuit"). A copy of the complaint from the Underlying Lawsuit is attached hereto as **Exhibit "A."**

28. The complaint alleged that toxic smoke and ash emitted from the pre-harvest fires traveled through the air and was deposited onto properties in the area, which negatively impacted workers in the fields as well as community residents. *See* Complaint, ¶ 46. The smoke and ash allegedly caused and manifested medical conditions and also discolored cars, homes, and office buildings. *Id*.

29. The complaint also leveled a host of unsupported allegations regarding the negative effects of sugarcane burning on health and property use/value. *See* Complaint, ¶¶ 61-101.

30. With respect to the class action allegations, one putative plaintiff purported to bring the Underlying Lawsuit on behalf of the "Property Damage Subclass." This subclass was defined as "All persons and legal entities that are or have been owners of real property located within the Affected Area from June 2015 to the present." Complaint, ¶ 111.

31. The other putative plaintiff purported to bring the Underlying Lawsuit on behalf of the "Medical Monitoring Subclass," which was defined as "All current residents of the Affected Area." Complaint, ¶ 112.

32. The complaint asserted causes of action for (1) Negligence, (2) Strict Liability for Ultrahazardous Activity, (3) Strict Liability under Fla. Stat. § 376.313, (4) Trespass, (5) Nuisance, (6) Medical Monitoring, and (7) Injunctive Relief.

**AIG's Refusal to Pay Any of U.S. Sugar's Defense Expenses and Conclusion of the Underlying Lawsuit**

33. At the time of the Underlying Lawsuit, AIG had issued U.S. Sugar four consecutive general liability policies that collectively provided coverage for the period from May 1, 2015 through May 1, 2019.

34. Despite lacking merit, the allegations of bodily injury and property damage in the Underlying Lawsuit fell squarely within the purview of these policies and required the expenditure

of substantial defense costs given the extensive damages sought in the complaint. As alleged in greater detail below, these policies were expressly written to cover both defense expenses and indemnity in response to third-party lawsuits containing allegations of bodily injury or property damage.

35. U.S. Sugar promptly wrote to AIG on June 14, 2019, to provide notice of the Underlying Lawsuit and a copy of the complaint.

36. U.S. Sugar communicated that, at a minimum, the policy covering the period from May 1, 2015 through May 1, 2016 was triggered, as this was the policy in effect during the first alleged occurrence in June 2015. *See* Complaint, ¶ 111. U.S. Sugar's notice also advised AIG of its intended selection of well-qualified defense counsel and invited AIG to reach out with any questions regarding the firms and lawyers that would be engaged to provide a defense.

37. AIG responded with a coverage letter on October 3, 2019, which did not dispute that the 2015-2016 insurance policy had been triggered by the Underlying Lawsuit's allegations of bodily injury and property damage. Yet, AIG took the position that the insurer was *never* obligated to pay *anything* under the operative policy so long as U.S. Sugar was only defending against the Underlying Lawsuit.

38. According to AIG, the insurance policy contained a $1 million self-insured retention ("SIR") that must first be paid by U.S. Sugar. But, the insurer argued that U.S. Sugar's defense expenses did not erode the SIR. As such, even if U.S. Sugar's defense expenses were to exceed the SIR, the carrier would have no payment obligation because not a single dollar of that defense would be credited toward the SIR.

39. In AIG's view, the insurer would only be responsible under the policy after U.S. Sugar made some payment in excess of $1 million in the form of indemnity, such as a settlement

or judgment. Stated otherwise, the insurer would owe nothing even if U.S. Sugar exceeded the SIR by successfully defending the Underlying Lawsuit without having to make any indemnity payment at all.

40. This position not only defies common sense, but also the plain policy language governing this issue.

41. Over the course of the next nine months, U.S. Sugar exchanged multiple correspondence with AIG regarding its reading of the policy language and provided numerous opportunities for the insurer to amend its coverage position regarding the application of the SIR.

42. As U.S. Sugar detailed in its letters, AIG's conclusion regarding the SIR is based on an incomplete reading of the policy language that ignores a "Retained Limit Amendatory Endorsement" that was expressly added to the policy to address the SIR issue. While this governing language makes clear that U.S. Sugar's defense costs do erode the SIR, AIG's position is based on other policy language that is superseded by the Retained Limit Amendatory Endorsement.

43. Notwithstanding the repeated opportunities afforded by U.S. Sugar, AIG refused to amend its coverage position and provide coverage.

44. These refusals culminated in U.S. Sugar being forced to file a Civil Remedy Notice of Insurer Violation ("CRN") with the Florida Department of Financial Services on July 17, 2020. The CRN notified the State that AIG, contrary to its statutory duties of good faith and fair dealing, was ignoring the governing policy language to reach the insurer's desired conclusion. The CRN provided AIG 60 days to cure the violations cited therein by (1) acknowledging that the Policy's SIR is eroded by U.S. Sugar's defense expenses, and (2) reimbursing U.S. Sugar for its attorneys' fees incurred in addressing AIG's incorrect coverage position. *See* CRN Filing No. 503858.

45. AIG refused to cure the CRN, would not amend its coverage position, and still refused to pay anything in connection with U.S. Sugar's defense to the Underlying Lawsuit notwithstanding the substantial exposure U.S. Sugar faced.

46. AIG instead elected to abandon U.S. Sugar for the entirety of the Underlying Lawsuit and left U.S. Sugar to defend the action as it deemed appropriate.

47. Without any reimbursement from AIG or any guarantee of insurance coverage in the future, U.S. Sugar engaged a legal team and experts to defend against the allegations in the Underlying Lawsuit and the substantial liability that the putative class plaintiffs sought to impose.

48. In light of the potential exposure, U.S. Sugar retained lead counsel who had extensive experience in environmental litigation, had been ranked as a top practitioner by Chambers in the area of environmental law, and had frequently appeared before the U.S. Supreme Court on environmental issues. U.S. Sugar also retained local counsel with significant experience in the areas of environmental and class action litigation, and who had successfully defended U.S. Sugar in environmental matters over several decades.

49. At no point during the litigation did AIG challenge the reasonableness or appropriateness of the professionals engaged by U.S. Sugar. Nor did the insurers attempt to associate in the defense of the case or the strategic decisions made during the course of the Underlying Lawsuit.

50. The Underlying Lawsuit continued over the course of several years, during which U.S. Sugar was forced to confront, *inter alia*, the addition of multiple class plaintiffs and their numerous amended complaints.

51. For example, after filing the initial complaint, the plaintiffs filed a first amended complaint shortly thereafter. U.S. Sugar filed a motion to dismiss the plaintiffs' first amended

complaint, which the trial court granted with leave to amend. The plaintiffs then filed a second amended complaint, to which U.S. Sugar filed another motion to dismiss. In response to that motion the plaintiffs sought leave to amend the complaint to address certain deficiencies, which the trial court granted. The plaintiffs then filed a third amended complaint, which U.S. Sugar met with yet another motion to dismiss. The first amended complaint, second amended complaint, and third amended complaint are attached hereto as **Exhibits "B," "C," and "D,"** respectively.

52. On July 2, 2021 – approximately two years after the Underlying Lawsuit began – the court dismissed two of the counts with prejudice but required U.S. Sugar (and the other defendants) to file an answer to the third amended complaint.

53. Every amended complaint filed by the plaintiffs continued to trigger AIG's obligation to defend U.S. Sugar once the self-insured retention was met.

54. The case subsequently proceeded to discovery, which only served to further undermine the remaining allegations leveled against U.S. Sugar. Just before certain deadlines requiring the plaintiffs to produce facts and evidentiary reports in support of their claims, the plaintiffs decided to voluntarily dismiss the entire case without any payment by U.S. Sugar.

55. On February 25, 2022, the parties in the Underlying Lawsuit filed a Stipulation of Dismissal with Prejudice. The trial court entered an order closing the case the same day.

56. While U.S. Sugar secured the best possible outcome in the Underlying Lawsuit, this result came at the cost of millions of dollars in defense expenses in excess of the Policy's $1 million SIR.

57. These defense expenses count toward the Policy's SIR and were due to be reimbursed by AIG once the SIR was exhausted.

**The SIR is Eroded by U.S. Sugar's Defense Expenses**

58.     To protect its business against the monetary exposure associated with third-party lawsuits like the one at issue, U.S. Sugar purchased a Commercial Umbrella Liability Policy With CrisisResponse from AIG with a policy period from May 1, 2015 through May 1, 2016 (the "Policy"). A copy of the Policy, bearing policy number BE 044212320, is attached as **Exhibit "E."**

59.     The Policy is U.S. Sugar's primary layer of general liability coverage, meaning that it is the first insurance policy that will respond to cover defense expenses and indemnity after the SIR is exhausted.

60.     The operative General Liability insuring agreement that responds to allegations of bodily injury and property damage provides, in relevant part: "We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance applies or because of Bodily Injury or Property Damage to which this insurance applies assumed by the Insured under an Insured Contract." Policy, § I(A).

61.     The insuring agreement goes on to provide, in relevant part, that "This policy applies, only if . . . the Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere, and the Bodily Injury or Property Damage occurs during the Policy Period." Policy, § I(B).

62.     Capitalized words and phrases are specifically defined by the Policy.

63. Bodily Injury is defined as "bodily injury, sickness or disease sustained by any person, including death, mental anguish, mental injury, shock or humiliation resulting from any of these at any time. Policy, § VII(C).

64. Property Damage is defined as "(1) physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or (2) loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the Occurrence that caused it. All such loss of use will be deemed to occur at the time of the Occurrence that caused it." Policy, § VII(Y).

65. With respect to Bodily Injury and Property Damage, Occurrence is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence." Policy, § VII(S).

66. Retained Limit is defined as "(1) the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or (2) the Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured." Policy, § VII(Z).

67. AIG does not dispute that the Policy's General Liability insuring agreement is triggered by the allegations in the Underlying Lawsuit.

68. Regarding the erosion of the SIR, AIG relies exclusively on Endorsement 23 to the Policy.

69. Endorsement 23 amends certain provisions of the General Liability coverage that applies to the allegations in the Underlying Lawsuit.

70. The endorsement states, in part, that the Self-Insured Retention in Item 5 of the Policy Declarations is amended to include the following additional provision: "$1,000,000 Each Occurrence (As respects all damages arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants covered under this endorsement). The Self-Insured Retention will not be reduced by Defense Expenses." Policy, End. 23., p. 2.

71. Endorsement 23 defines Defense Expenses, in part, as "a payment allocated to defend a specific Suit, including but not limited to . . . Attorneys' fees and all other investigation, loss adjustment and litigation expenses."

72. A subsequent endorsement in the Policy, however, entirely *eliminates and replaces* the Policy's schedule of self-insured retentions contained in Item 5 of the Policy Declarations.

73. Endorsement 26 is entitled "Retained Limit Amendatory Endorsement" (the "SIR Endorsement") and states in the very first sentence: "The Declarations, Item 5. Self Insured Retention is deleted in its entirety." Policy, End. 26, § 1, p. 1.

74. The SIR Endorsement then provides new policy language that addresses the erosion of the retentions and replaces Item 5 that was deleted in its entirety.

75. The SIR Endorsement first establishes that AIG has a duty to defend U.S. Sugar once the SIR has been exhausted by the payment of covered Loss: "We will have the right and duty to defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when the applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of Loss to which this policy applies." Policy, End. 26, § 3, pp. 1-2.

76. The SIR Endorsement then redefines what is considered covered Loss under the Policy, and states: "Loss means those sums actually paid as judgments or settlements, provided, however, that if the applicable Retained Limit is specifically designated in the Schedule of Retained Limits as including Defense Expenses, *then Loss shall include such Defense Expenses*." Policy, End. 26, § 10, p. 3 (emphasis added).

77. The SIR Endorsement defines Defense Expenses, in part, as "payment(s) allocated to the investigation, settlement or defense of a specific loss, claim or Suit, including but not limited to . . . Attorneys' fees and all other investigation, loss adjustment and litigation expenses." Policy, End. 26, § 6, p. 2.

78. The SIR Endorsement also amends the definition of Retained Limit, which means "the applicable limit(s) listed in the Schedule of Retained Limits." Policy, End. 26, § 12, p. 3.

79. The definition of Retained Limit goes on to provide, in relevant part: "The Retained Limit(s) listed in the Schedule of Retained Limits will apply whether or not there is any available Scheduled Underlying Insurance or Other Insurance. If there is Scheduled Underlying Insurance or Other Insurance applicable to a Loss, *amounts received through such Scheduled Underlying Insurance or Other Insurance for payment of the Loss may be applied to reduce or exhaust the Retained Limit.* Furthermore, (a.) If the applicable Retained Limit is specifically designated in the Schedule of Retained Limits as including Defense Expenses, then amounts received through Scheduled Underlying Insurance or Other Insurance providing coverage to the Insured for the Payment of Defense Costs *shall reduce the Retained Limit*." Policy, End. 26, § 12, p. 3 (emphasis added).

80. Simply stated, the reader must look to the new Schedule of Retained Limits contained within the SIR Endorsement to determine whether Defense Expenses are part of those

limits.  If so, Defense Expenses will erode the retention – *even if* those expenses are covered by another insurance policy.

81. At the end of the SIR Endorsement is the new Schedule of Retained Limits addressing the various coverages contained within the Policy.  Policy, End. 26, p. 4.  Next to the General Liability coverage – the coverage applicable to the Underlying Lawsuit – the schedule confirms that there is a $1,000,000 retained limit for "Each Occurrence" and expressly states: "*Limits are inclusive of the Defense Expenses*."  Policy, End. 26, p. 4 (emphasis added).

82. A plain reading of this language indicates that Defense Expenses are "included" within the retained limit, meaning that they erode the amount for which U.S. Sugar is responsible.

83. Further, the SIR Endorsement takes the additional step of clarifying that its terms control over any other conflicting endorsements or policy language.

84. The SIR Endorsement expressly provides: "If another endorsement attached to this policy states specifically that the provisions therein supersede any other terms, definitions, conditions, and exclusions of any language in this policy or its endorsements, then the provisions of such other endorsement apply irrespective of anything to the contrary in the provisions of this endorsement.  *In all other cases, the provisions of this endorsement apply notwithstanding anything to the contrary in the other terms, definitions, conditions, and exclusions[,] terms and conditions of this policy*."  Policy, End. 26, §14, p. 4 (emphasis added).

85. In plain terms, the SIR Endorsement controls over any other endorsements – even in the face of conflicting language – unless the other endorsement specifically states that its terms supersede.

86. Endorsement 23, on which AIG relies, contains *no language* indicating that its terms control over the SIR Endorsement.

87. Accordingly, the SIR Endorsement governs the issue of whether the SIR is eroded by the payment of Defense Expenses.

88. Here, the policy language in the SIR Endorsement is clear and unambiguous. It provides that (1) payments for Defense Expenses reduce the $1 million retention, and (2) the terms of the SIR Endorsement control over any other conflicting policy language.

89. Even if there were another interpretation of the Policy that would lead to a different conclusion, courts in this state are compelled to adopt the interpretation that results in coverage for the policyholder.

90. Under Florida law, if policy language is susceptible of two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous. Ambiguities are construed in favor of the insured without resort to extrinsic evidence.

91. AIG's interpretation of the Policy is not reasonable in the first instance because it relies on Endorsement 23, which is superseded by the plain language of the SIR Endorsement.

92. But even if AIG's interpretation were reasonable (which it is not), the Policy must be deemed ambiguous because U.S. Sugar has offered a reasonable interpretation whereby the payment of Defense Expenses reduces the $1 million SIR.

93. Under these circumstances, Florida law requires a court to adopt the policy interpretation that affords coverage to the insured without further inquiry.

94. The amounts paid by U.S. Sugar to defend against the Underlying Lawsuit exceed the applicable $1 million SIR.

95. AIG has refused to reimburse U.S. Sugar for any amounts under the Policy.

96. U.S. Sugar is entitled to reimbursement for all amounts expended in its defense of the Underlying Lawsuit in excess of the $1 million SIR.

**Compliance with All Conditions Precedent**

97. U.S. Sugar has satisfied all of the applicable terms, conditions, and other requirements of the Policy. Alternatively, compliance with the applicable terms, conditions, and other requirements in whole or in part has been waived, excused, or is unnecessary for other reasons.

**Retention of Counsel**

98. U.S. Sugar has retained the law firm of Hunton Andrews Kurth LLP and its attorneys to represent the company in this action and has agreed to pay it reasonable attorneys' fees, plus all expenses incurred, for its services.

**COUNT I – BREACH OF CONTRACT**

99. U.S. Sugar re-alleges the preceding paragraphs as if fully set forth herein.

100. The Contract: At all material times, U.S. Sugar was insured under the Policy, which is a binding, valid, and enforceable contract under Florida law.

101. The damages in connection with the Underlying Lawsuit, including but not limited to U.S. Sugar's defense costs/expenses, are covered by the Policy and exceed the SIR. None of the terms, provisions, conditions, or exclusions in the Policy apply to bar coverage.

102. Breach: AIG, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the Policy and thus breached the contract by its acts or omissions as alleged herein, including without limitation, its failure and refusal to pay any amounts borne by U.S. Sugar in connection with the Underlying Lawsuit.

103. Damages: As a direct, proximate, and natural result of AIG's breaches, U.S. Sugar has been deprived of the benefits due under the Policy.

WHEREFORE, Plaintiff United States Sugar Corporation demands judgment against Defendant, Commerce and Industry Insurance Company, for damages, pre- and post-judgment interest, attorneys' fees pursuant to Fla. Stat. § 627.428, costs, and any further relief this Court deems equitable, just, and proper.

## JURY DEMAND

U.S. Sugar demands trial by jury on all issues so triable.

Dated: June 7, 2022

Respectfully submitted,

HUNTON ANDREWS KURTH LLP

/s/ *Walter J. Andrews*
Walter J. Andrews – Trial Counsel
Fla. Bar No. 84863
Cary D. Steklof
Fla. Bar No. 86257
Hunton Andrews Kurth LLP
Wells Fargo Center
333 S.E. 2nd Avenue, Suite 2400
Miami, FL 33131
Tel: (305) 810-6407
Fax: (305) 810-2460
wandrews@HuntonAK.com
csteklof@HuntonAK.com

*Attorneys for Plaintiff United States Sugar Corporation*